# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

BMC-THE BENCHMARK
MANAGEMENT COMPANY, et al.,

                **Plaintiffs,**

    v.                             **1:05-cv-1149-WSD**

CEEBRAID-SIGNAL
CORPORATION, et al.,

                **Defendants.**

## OPINION AND ORDER

This matter is before the Court on Plaintiff BMC-The Benchmark

Management Company's Motion for Summary Judgment on Defendant CSC

Georgian Terrace Limited Partnership's ("CSC") Counterclaim [201]; Defendants

Fremont Realty Capital, L.P., FSPP II Georgian, L.L.C., FSPP II Georgian Lender,

L.L.C., and Frederick Zarrilli's (collectively "Fremont")[1] Motion for Summary

Judgment [207]; Defendants CSC, CSC Georgian Terrace GP Corporation,

Ceebraid Acquisition Corporation, Ceebraid-Signal Corporation ("Ceebraid-

Signal"), Georgian Terrace GP Corporation, Georgian Terrace Limited Partnership,

---

[1]  The Court dismissed Fremont Strategic Property Partners II, L.P. from this action for lack of personal jurisdiction on June 13, 2007.  (June 13, 2007, Order [237].)

Adam Schlesinger, and Richard Schlesinger's (collectively the "Ceebraid Defendants" or "Ceebraid") Motion for Partial Summary Judgment [208]; and Defendant CSC's Motion to Dismiss Counterclaim [229].

## I.   <u>BACKGROUND</u>

Plaintiffs in this action are BMC-The Benchmark Management Company, a hotel management company, and BMC-The Benchmark Equipment Company, a supplier of hotel equipment and in-room amenities (collectively "Benchmark" or "Plaintiffs").  In August 2004, Defendant Ceebraid Acquisition Corporation entered into an agreement (the "Purchase Agreement") to purchase the Georgian Terrace Hotel in Atlanta, Georgia, (the "Hotel") from AGL Investments No.2 Limited Partnership ("AGL").  (Ceebraid Statement of Material Facts ("SMF") [208] ¶ 1.)  The Purchase Agreement provided that Ceebraid Acquisition Corporation could assign the agreement to an entity it would form in the future.[2] (II Pl. SMF [221] ¶ 4.)[3]  Adam and Richard Schlesinger are principals of Ceebraid. (Fremont SMF [207] ¶ 1.)

---

[2]  Ceebraid Acquisition Corporation did eventually assign the Purchase Agreement to CSC, an entity it formed prior to the transaction.  (Ceebraid SMF ¶ 21.)

[3]  Benchmark submitted two different Statements of Material Facts in response to motions for summary judgment filed by Fremont and Ceebraid.  The Court refers to them by the order in which they were filed.

Since 2002, Benchmark had operated the Hotel for AGL under a long-term management agreement.  (I Pl. SMF [220] ¶ 1.)  When the Ceebraid Defendants decided to purchase the Hotel in 2004, they approached Benchmark to discuss the future management of the Hotel.  The Ceebraid Defendants asked Benchmark to continue managing the Hotel during the interim six-month period after the Hotel acquisition and prior to a planned year-long shutdown for renovations.  (I Pl. SMF ¶ 7.)  Benchmark informed Ceebraid that it would not manage the Hotel on a short-term basis and that it was interested only in a long-term arrangement.  (II Pl. SMF ¶ 7.)

Having taken these respective positions, on November 1, 2004, Jeffrey Farina, Benchmark's Chief Development Officer, and Richard Schlesinger, President of Ceebraid-Signal, signed a "Letter Agreement" that purported to "confirm the key points of the agreement" between Benchmark and Ceebraid-Signal regarding the management of the Hotel.  The Letter Agreement was to take effect on or about November 15, 2004, or upon closing.  (Ceebraid SMF ¶ 6, II Pl. SMF ¶ 8; Exhibit 2 attached to R. Schlesinger Dep. [221].)

The Letter Agreement stated the following key points:

- Benchmark Hospitality will provide management services for the Georgian Terrace Hotel, located in Atlanta, Georgia, in accordance with the terms

> outlined in the attached Management Agreement, contingent on the acquisition of the property by Ceebraid-Signal.
>
> • Upon your acquisition of the hotel, the existing Management [Agreement] (which is provided as an attachment to this agreement) will be amended by letter to reflect the change in ownership of the property. . . .
>
> • The initial term of this agreement will be six (6) months. During this time period, it is the intent of both parties to utilize their best efforts to negotiate and put in place a long term management agreement for the property. It is anticipated that the long term management agreement will be for no less then [sic] a five (5) year term.

The parties attached to the Letter Agreement the agreement between AGL and Benchmark under which Benchmark had previously managed the Hotel for AGL ("AGL Agreement"). (II Pl. SMF ¶ 9.)

In the fall of 2004, Defendant Frederick Zarrilli, Managing Director of Fremont Realty Capital, L.P., learned of the opportunity to invest in Ceebraid's purchase of the Hotel. (Fremont SMF ¶ 1.) Fremont had previously invested in two Ceebraid real estate ventures. (Fremont SMF ¶ 2.) Fremont became a significant creditor for, and investor in, Ceebraid's acquisition of the Hotel. It provided a $30 million senior loan, a $28 million mezzanine loan, and a $3 to $4 million equity investment for the purchase of the Hotel. (Ceebraid SMF ¶ 15;

Fremont SMF ¶ 3.)  Fremont learned of the potential investment opportunity in the

fall of 2004, but did not sign a letter of intent confirming its proposed participation

in the transaction until March 4, 2005.  (Ceebraid SMF ¶ 16.)

Prior to acquiring the Hotel, Ceebraid developed a tentative business plan

for the property.  (Fremont SMF ¶ 4.)  The plan included shutting down the Hotel

approximately four months after the acquisition, significantly renovating the Hotel

over a one-year period, and reopening the Hotel as a luxury boutique hotel with

condominiums available for sale.  (Fremont SMF ¶ 5.)  Despite the November 1,

2004 Letter Agreement, as early as January 2005, Ceebraid initiated negotiations

with other hotel management companies, including Fairmont Hotels, for the

Hotel's management.  (II Pl. SMF ¶ 34.)

A few days before the closing on March 18, 2005, Defendant Zarrilli learned

about the Letter Agreement between Benchmark and Ceebraid-Signal.  (Ceebraid

SMF ¶ 17.)  Ceebraid told Fremont that it asked Benchmark to continue managing

the Hotel for the four-month period after the acquisition and prior to closing the

Hotel for the renovation because it believed Benchmark was necessary to the

operation of the Hotel.  (Ceebraid SMF ¶ 18.)  Fremont, however, considered

Benchmark's potential long-term management of the Hotel unacceptable and

inconsistent with the proposed investment business plan.  (Ceebraid SMF ¶ 19.)

Because Fremont did not know of Benchmark's potential long-term management of the Hotel and had never discussed it with Benchmark, Fremont was uncomfortable with the Letter Agreement. (Ceebraid SMF ¶ 20.) To address Fremont's concerns, Fremont and Ceebraid entered into an indemnification agreement whereby Ceebraid agreed to take financial responsibility for any costs resulting from the Letter Agreement. (Fremont SMF ¶¶ 21-23.) The indemnification agreement was retroactively effective as of March 18, 2005, the date of the Hotel acquisition. (I Pl. SMF ¶ 42).

Around March 14, 2005, Ceebraid's counsel asked Benchmark to execute a subordination agreement that had been drafted by Fremont's counsel. (II Pl. SMF ¶ 23.) The subordination agreement provided that Ceebraid-Signal had executed the Letter Agreement as an agent for Ceebraid Acquisition Corporation. (I Pl. SMF ¶ 25.) Benchmark signed the subordination agreement. (II Pl. SMF ¶ 24.)

On March 18, 2005, CSC, a separate legal entity formed by the Ceebraid Defendants, purchased the Hotel. (Ceebraid SMF ¶ 21.) On the same day, Richard Schlesinger contacted Sam Haigh, President and Chief Executive Officer of Benchmark, and told him that Ceebraid did not intend to retain Benchmark beyond the four-month period preceding the Hotel renovation. (I Pl. SMF ¶ 35.) Schlesinger also requested that Benchmark sign a letter confirming it would

manage the Hotel for the four-month period.  (I Pl. SMF ¶ 34.)  Haigh reminded

Schlesinger of the Letter Agreement and refused to sign the letter.  (I Pl. SMF ¶ 36-

37.)  After the acquisition, Benchmark continued to perform management services

at the Hotel, and Ceebraid paid Benchmark for a portion of those services.  (II Pl.

SMF ¶ 18-19.)[4]

On April 8, 2005, Richard Schlesinger sent a letter to Haigh (the "April 8

Letter"), stating that the Letter Agreement was executed by Benchmark and

Ceebraid-Signal and thus was effective only upon Ceebraid-Signal's acquisition of

the Hotel. (II Pl. SMF ¶ 28; Attachment A to Haigh Decl.)  Schlesinger claimed

that because CSC, not Ceebraid-Signal, had acquired the Hotel, and CSC was not a

party to the Letter Agreement, it was not binding.  Schlesinger told Haigh that CSC

was considering several different potential ownership structures and was finalizing

plans for the renovation and potential conversion of the Hotel.  Schlesinger stated

---

[4]  Benchmark contends that it operated the Hotel pursuant to the terms of the
Letter Agreement and AGL Agreement.  (II Pl. SMF ¶ 19.)  Ceebraid contends that
although Benchmark continued to render management services, it was not done
pursuant to the AGL or Letter Agreement.  (Ceebraid Opp. to Pl. SMF ¶ 18.)
Similarly, Benchmark claims that Ceebraid's payments to Benchmark were
required by the AGL Agreement.  (II Pl. SMF ¶ 19.)  Ceebraid concedes that it
paid Benchmark but argues that it did not make the payments pursuant to the AGL
Agreement.  (Ceebraid Opp. to Pl. SMF ¶ 19.)  Benchmark also alleges that
additional fees are due under the AGL Agreement, a fact that Ceebraid disputes.
(II Pl. SMF ¶ 20; Ceebraid Opp. to Pl. SMF ¶ 20.)

that CSC would consider proposals from Benchmark to provide management services should those services be necessary in the new operating and ownership structure selected.  Schlesinger asked Benchmark to let him know if Benchmark would manage the Hotel until the planned renovation.  Although Benchmark maintained that the Letter Agreement was valid and binding, on April 22, 2005, it ceased managing the property.  (II Pl. SMF ¶ 33.)

On May 2, 2005, Benchmark filed this action.  Benchmark asserted a claim against Fremont for tortious interference with contract, alleging that Fremont interfered with the Letter Agreement and Benchmark's ability to negotiate a long-term management agreement for the Hotel.  (Am. Compl. [117] ¶ 75.)  Benchmark asserts against the Ceebraid Defendants claims for fraud, civil conspiracy, aiding and abetting fraud, unjust enrichment, and breach of contract.  Benchmark alleges that the Ceebraid Defendants intentionally made false representations to Benchmark in order to convince it to operate the Hotel on an interim basis.

On December 30, 2005, the Ceebraid Defendants filed their Answer, and CSC asserted a Counterclaim against Benchmark.  On January 5, 2006, Benchmark filed a Motion to Dismiss CSC's Counterclaim.  On August 1, 2006, the Court denied Benchmark's Motion to Dismiss.  On February 15, 2007, Benchmark filed a Motion for Summary Judgment on CSC's Counterclaim.  On March 12, 2007, CSC

filed a Motion for Voluntary Dismissal of its Counterclaim.  Fremont has filed a
Motion for Summary Judgment on Benchmark's tortious interference claim, and
the Ceebraid Defendants have filed a Motion for Partial Summary Judgment on the
claims asserted against them.

## II.    DISCUSSION

### A.    CSC's Motion for Voluntary Dismissal of its Counterclaim

CSC asks this Court to enter a voluntary dismissal of its Counterclaim under
Federal Rules of Civil Procedure 41(a)(2) and 41(c).  Rule 41(a)(2) provides that
after an answer or motion for summary judgment has been filed, "an action shall
not be dismissed at the plaintiff's instance save upon order of the court and upon
such terms and conditions as the court deems proper."  Fed. R. Civ. P. 41(a)(2).
Unless otherwise specified in the order, a dismissal under Rule 41(a)(2) is without
prejudice.  Id.  Rule 41(c) provides that the provisions of Rule 41 apply to
counterclaims as well as to claims by a plaintiff.

CSC states that it seeks voluntary dismissal because it is not cost effective to
proceed with its Counterclaim, and the "nominal damages that can be established
with respect to the Counterclaim do not justify the expense of litigating the matter
further."  (CSC Mot. for Voluntary Dismissal [229] at 1.)  CSC argues that the
Counterclaim is viable "as a legal matter," but that "as a practical matter, the

amount of the claim does not justify retaining it in this litigation."  (Id. at 2.)

Benchmark argues it will be prejudiced if CSC is permitted to dismiss its Counterclaim without prejudice.  Benchmark claims it spent significant sums in discovery directed exclusively at the Counterclaim and that it has a pending motion for summary judgment on the Counterclaim.  (Pl. Resp. [232] at 1.)  Benchmark does not ask the Court to award costs or attorneys' fees associated with the Counterclaim at this time.  Instead, it asks that the Court dismiss the Counterclaim with prejudice and allow Benchmark to "reserve any motion [they] may wish to make with respect to fees and costs until the conclusion of this litigation."  (Id. at 2.)  The question before the Court is whether and on what terms the Court should dismiss the Counterclaim under Rule 41(a)(2).

In applying Rule 41(a)(2), the Eleventh Circuit has held:

> A voluntary dismissal without prejudice is not a matter of
> right.  Although we have said that in most cases a
> voluntary dismissal should be allowed unless the
> defendant will suffer some plain prejudice other than the
> mere prospect of a second lawsuit, the decision whether
> or not to grant such a dismissal is within the sound
> discretion of the district court . . . .

Fisher v. P.R. Marine Mgmt., Inc., 940 F.2d 1502, 1502-03 (11th Cir. 1991) (citations omitted).  The purpose of Rule 41(a)(2) is to preclude voluntary dismissals which inequitably affect the opposing party and to allow the

-10-

implementation of curative conditions by the court.  Farmaceutisk Laboratorium

Ferring A/S v. Reid Rowell, Inc., 142 F.R.D. 179, 181 (N.D. Ga. 1991) (citing

McCants v. Ford Motor Co., Inc., 781 F.2d 855, 856 (11th Cir. 1986)).  "[W]hen

exercising its discretion in considering a dismissal without prejudice, the court

should keep in mind the interests of the defendant, for Rule 41(a)(2) exists chiefly

for protection of defendants."  Fisher, 940 F.2d at 1503.  As the Eleventh Circuit

further explained: "[t]he crucial question to be determined is, [w]ould the

defendant lose any substantial right by the dismissal."  Pontenberg v. Boston

Scientific Corp., 252 F.3d 1253, 1255 (11th Cir. 2001).  The prospect of a second

lawsuit on the same set of facts is not sufficient legal prejudice to the defendant to

justify denying a plaintiff's motion to dismiss without prejudice.  See Durham v.

Fla. E. Coast Ry. Co., 385 F.2d 366 (5th Cir. 1967); McCants, 781 F.2d at 859.

Elaborating on this concept, the Eleventh Circuit noted in Pontenberg: "[D]elay

alone, *in the absence of bad faith*, is insufficient to justify a dismissal with

prejudice . . . ."  Pontenberg, 252 F.3d at 1259 (emphasis added).

If a court grants a dismissal without prejudice under Rule 41(a)(2), it

possesses broad discretion in determining what terms and conditions, if any, should

be imposed as a condition for dismissal.  Farmaceutisk, 142 F.R.D. at 181.  "The

district court must exercise its broad equitable discretion under [Rule 41] to weigh

-11-

the relevant equities and do justice between the parties in each case, imposing such costs and attaching such conditions to the dismissal as are deemed appropriate." Id. (citing McCants, 781 F.2d at 857).  Plaintiffs usually are not allowed to dismiss an action without prejudice under Rule 41(a)(2) "after the defendant has been put to considerable expense in preparing for trial, except on condition that the plaintiff reimburse the defendant for at least a portion of his expenses of litigation." McCants, 781 F.2d at 860.  The Eleventh Circuit has stated that a Court may require Plaintiff to pay "all litigation-related expenses incurred by the defendant, including reasonable attorneys' fees."  Id.

The Eleventh Circuit has not explicitly adopted factors that a trial court should evaluate to determine whether a defendant would "suffer 'plain prejudice' versus the 'mere prospect of a second lawsuit'" in deciding if dismissal without prejudice is appropriate.[5]  Mosley v. JLG Indus. Inc., No. 7:03CV119HL, 2005

---

[5]  Several other circuit courts have adopted a list of factors for trial courts to consider when deciding whether to grant motions to dismiss without prejudice. They are:  "the defendant's effort and expense of preparation for trial, excessive delay and lack of diligence on the part of the plaintiff in prosecuting the action, insufficient explanation for the need to take a dismissal, and whether a motion for summary judgment has been filed by the defendant."  Mosley, 2005 WL 2293567 at *3 n.1 (citing Pace v. S. Express Co., 409 F.2d 331, 334 (7th Cir. 1969)).  The Eleventh Circuit noted in Pontenberg, however, that "this circuit has never specifically addressed or adopted the Pace factors."  Id. (citing Pontenberg, 252 F.3d at 1259).

WL 2293567, at *3 (M.D. Ga. Sept. 20, 2005) (noting the Eleventh Circuit's failure to adopt specific factors for Rule 41(a)(2) dismissal and reviewing cases where the court denied dismissal under the rule).  The <u>Mosley</u> court noted, however, that the cases in our circuit "have hinged on various factors as the courts sought 'to weigh the relevant equities and do [justice] between the parties.'" <u>Id.</u> at *3.  That is, substantial discretion is vested in the district court to determine and implement a just resolution.

When courts in this circuit have denied a plaintiff's Rule 41(a)(2) motion for dismissal without prejudice, several factors were frequently important to the decision.  These factors include the length of time and amount of resources spent by the defendant litigating the case, dilatory tactics by the plaintiff, and the presence of a motion for summary judgment pending when the plaintiff requested dismissal.  <u>See</u> <u>Stephens v. Ga. Dep't of Transp.</u>, 134 F. App'x 320, 323 (11th Cir. 2005); <u>Fisher</u>, 940 F.2d at 1503; <u>Mosley</u>, 2005 WL 2293567, at *3; <u>McBride v. JLG Indus., Inc.</u>, No. 7:03CV118HL, 2005 WL 2293566, at *3 (M.D. Ga. Sept. 20, 2005).  Courts are more likely to deny a voluntary dismissal where the plaintiff has been dilatory in conducting the litigation.

The Court concludes that Benchmark will not suffer sufficient legal prejudice to deny CSC's request for dismissal without prejudice.  The Court does

not find under the circumstances of this case that CSC or its counsel acted in bad faith in bringing the Counterclaim, nor does Benchmark allege bad faith in its opposing brief.  CSC has not acted with a dilatory purpose, nor has it failed to properly prosecute the Counterclaim.  Although the period for discovery closed on November 30, 2006, and Benchmark has already filed a dispositive motion with respect to the Counterclaim, dismissal without prejudice is nonetheless appropriate. See Pontenberg, 252 F.3d at 1258-59 (finding that delay alone, in the absence of bad faith, "is insufficient to justify a dismissal with prejudice, even where a fully briefed summary judgment motion is pending").  "[T]he mere pendency of a summary judgment motion, by itself, does not constitute legal prejudice sufficient to support a denial of a Rule 41(a)(2) voluntary dismissal without prejudice." Id. at 1258.

The Court recognizes that the parties to this litigation engaged in a significant amount of discovery, not only in regard to the Counterclaim, but also in regard to several claims Benchmark alleged against CSC and related entities. Benchmark does not contend that it has substantially prepared for trial.  Instead, it focuses on the merits of CSC's Counterclaim and argues that CSC does not have a sufficient explanation for its voluntary dismissal.  Benchmark has not shown that it will suffer legal prejudice sufficient to deny dismissal of the Counterclaim without

-14-

prejudice.  Indeed, the dismissal will simplify the case and save the parties the

expense that would be associated with trying issues raised in the Counterclaim.[6]

B.      Standard of Review on Motion for Summary Judgment

Summary judgment is appropriate where "the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if

any, show that there is no genuine issue as to any material fact and that the moving

party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party

seeking summary judgment bears the burden of demonstrating the absence of a

genuine dispute as to any material fact.  Herzog v. Castle Rock Entm't, 193 F.3d

1241, 1246 (11th Cir. 1999).  Once the moving party has met this burden, the non-

movant must demonstrate that summary judgment is inappropriate by designating

specific facts showing a genuine issue for trial.  Graham v. State Farm Mut. Ins.

Co., 193 F.3d 1274, 1282 (11th Cir. 1999).  The non-moving party "need not

present evidence in a form necessary for admission at trial; however, he may not

---

[6]  The Court also considers whether CSC's conduct in the action resulted in Benchmark's incurring a burden and expense for which equities and justice require that it be compensated.  See Farmaceutisk, 142 F.R.D. at 181.  In this case, however, Benchmark does not move for an award of litigation expenses. Benchmark asks only that the Court allow it to "reserve any motion [it] may wish to make with respect to fees and costs until the conclusion of this litigation." (Resp. to Mot. to Dis. C'claim at 2.)  The Court will not prohibit Benchmark from making a motion regarding fees and costs associated with the Counterclaim at a later date.

merely rest on his pleadings." Id.

The Court must view all evidence in the light most favorable to the party opposing the motion and must resolve all reasonable doubts in the non-movant's favor. United of Omaha Life Ins. Co. v. Sun Life Ins. Co. of Am., 894 F.2d 1555, 1557-58 (11th Cir. 1990). "[C]redibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury . . . ." Graham, 193 F.3d at 1282. "If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial." Herzog, 193 F.3d at 1246. But, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," summary judgment for the moving party is proper. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

C.    Benchmark's Tortious Interference Claim against Fremont

Fremont argues that Benchmark's tortious interference claim fails because Benchmark cannot meet the requirements of any of the four elements of a claim for tortious interference under Georgia law. Specifically, Fremont argues: 1) Fremont is not a stranger to the Letter Agreement or the business relationship between Ceebraid and Benchmark; 2) Fremont acted to protect its own interests, not with the intent of harming Benchmark; 3) Benchmark cannot prove that the Letter

Agreement was enforceable or that it had a prospective business relationship with

Ceebraid; and 4) Benchmark cannot show damages caused by Fremont's actions.

(Fremont Opp. to MSJ [207] at 10.)

The law in Georgia regarding tortious interference is well-developed.

"Parties to a contract have a property right therein with which a third party cannot

interfere without legal justification or privilege, and a party injured by another's

wrongful interference may seek compensation in tort." Atlanta Mkt. Ctr. Mgmt.,

Co. v. McLane, 269 Ga. 604, 608 (1998) (citing Luke v. Du Pree, 158 Ga. 590,

590(1) (1924) and O.C.G.A. § 51-12-30).

"In order to prevail on a claim alleging tortious interference with contract, a

plaintiff must establish the existence of a valid contract and that the defendant

acted intentionally, without privilege or legal justification, to induce another not to

enter into or continue a business relationship with the plaintiff, thereby causing the

plaintiff financial injury." Id. (citing Lake Tightsqueeze, Inc. v. Chrysler First Fin.

Servs. Corp., 210 Ga. App. 178, 181 (1993)). The plaintiff's burden includes

showing that the defendant was a "meddler," "interloper," or "stranger" to the

contract or business relationship underlying the contract. Disaster Servs., Inc. v.

ERC P'ship, 228 Ga. App. 739, 741 (1993). "After proving the existence of a

contract, it is essential to a claim of tortious interference with contractual relations

-17-

that the plaintiff establish that the defendant is a 'third party,' i.e., a 'stranger' to the contract with which the defendant allegedly interfered." Atlanta Mkt. Ctr., 269 Ga. at 608. "Moreover, in order to be liable for tortious interference, one must be a stranger to both the contract at issue and the business relationship giving rise to and underpinning the contract." Tidikis v. Network for Med. Commc'ns & Research, LLC, 274 Ga. App. 807, 812 (2005) (quoting Atlanta Mkt. Ctr., 269 Ga. at 609). "For purposes of this type of tort, 'privilege' means legitimate economic interests of the defendant or a legitimate relationship of the defendant to the contract, so that it is not considered a stranger, interloper, or meddler." Disaster Servs., 228 Ga. App. at 741 (citing Driggers v. Cont'l Grain Co., 210 Ga. App. 293, 294 (1993)).

The "stranger doctrine" protects from liability more entities than just those who are parties to the agreement: "[o]ne is not a stranger to the contract just because one is not a party to the contract." Atlanta Mkt. Ctr., 269 Ga. at 608. Georgia courts have found that many entities who are not parties to a contract may not be strangers to a contract. See id. at 608-09 (observing that agents, attorneys, corporate presidents, and employee supervisors, acting in relation to or on behalf of parties to a contract, were found not to be strangers to such contracts).

The stranger doctrine also shields from liability third-party beneficiaries of a

-18-

contract.  "The intended third-party beneficiary of a contract, legally authorized to enforce the contract, cannot be held liable for tortious interference since he is not a stranger to the contract." Id. at 609 (citing Cohen v. William Goldberg & Co., 202 Ga. App. 172 (1991)).

Georgia Courts have modified the stranger doctrine by narrowing the classes of entities that may be liable for tortious interference. Id. at 609.  The exclusion of third-party beneficiaries from liability now encompasses entities that benefit from contracts made by others, regardless of whether the contracting parties intended to benefit the entity. Lake Tightsqueeze, 210 Ga. App. at 181.  "[A party] with a direct economic interest in [a] contract, even though not a third-party beneficiary, is not a stranger to the contract." Atlanta Mkt. Ctr., 269 Ga. at 609 (citing Disaster Servs., 228 Ga. App. at 739).  "Where appropriate circumstances appear from the evidence that a defendant had a legitimate interest in either the contract or a party to the contract, the defendant is not a stranger to the contract . . . ." Disaster Servs., 228 Ga. App. at 741 (stating that, to be exempt from liability for tortious interference, the defendant need only "have a bona fide economic interest in the contract or relationship with one of the parties to the contract") (citing Renden, Inc. v. Liberty Real Estate Ltd. P'ship III, 213 Ga. App. 333, 336(2)(b) (1994)).

The facts in Jefferson-Pilot Commc'ns. Co. v. Phoenix City Broad., Ltd. of

Atlanta, 205 Ga. App. 57 (1992), are similar to the facts here.  In Jefferson-Pilot,

the Court considered whether the purchaser of a radio station was a stranger to the

contractual relationship between the sellers and its lenders.  In finding that the

purchaser was not a stranger to the lending contract, the Court held that "all parties

to a comprehensive interwoven set of contracts which provided for the financing,

construction, and transfer of ownership" were not strangers.  Jefferson-Pilot, 205

Ga. App. at 60.  "Thus, in order for a defendant to be liable for tortious interference

with contractual relations, the defendant must be a stranger to both the contract *and*

the business relationship giving rise to and underpinning the contract."  Atlanta

Mkt. Ctr., 269 Ga. at 609 (citing Renden, 213 Ga. App. at 333).

        The evidence in this case shows that Fremont had a bona fide economic

relationship with Ceebraid and an economic interest in the Letter Agreement

between Ceebraid and Benchmark.[7]  Ceebraid introduced Fremont to the

investment opportunity so that it could persuade Fremont to acquire an economic

interest in the venture.  Throughout the fall and winter of 2004, Ceebraid sought

investors to obtain the financing necessary to close on the purchase of the Hotel.

---

        [7]  The Court assumes for the purposes of this analysis that Benchmark has
established that the Letter Agreement was an enforceable contract with which
Fremont has allegedly interfered.  The Court, however, finds that the Letter
Agreement is not an enforceable contract under Georgia law.

In Fall 2004, Ceebraid began negotiating with Fremont so that Fremont could become an investor in and lender for the purchase.  Because of this economic interest, Fremont became concerned about the potential liability that might result from the Letter Agreement.  There is no evidence that Fremont improperly interfered with the Letter Agreement, or even had knowledge of it, before Ceebraid asked Fremont to invest in the venture.  (I Pl. SMF ¶¶ 17, 26.)

The Letter Agreement, assuming it was contract, was part of an "interwoven set of contracts" such that Fremont could not be a stranger to the Letter Agreement. Benchmark, Fremont, and Ceebraid, as a group, signed several agreements in connection with the Hotel purchase.  The interrelationship between the Letter Agreement, indemnity agreement, subordination agreement, and Purchase Agreement is underscored by the fact that the Letter Agreement, by its terms, was not to take effect *unless* Ceebraid-Signal executed the Purchase Agreement. Likewise, Fremont would provide funding for the purchase only if Ceebraid signed the indemnity agreement, thus allocating the risk of liability from the Letter Agreement to Ceebraid.

The Court finds that Fremont was not a stranger to either the Letter Agreement between Benchmark and Ceebraid or the business relationship between them, thus it cannot be liable for interfering with Benchmark and Ceebraid's

business relationship.  Atlanta Mkt. Ctr., 269 Ga. at 608.  Because Benchmark

cannot establish an element essential to its cause of action for tortious interference,

Fremont is entitled to summary judgment on Benchmark's tortious interference

claim.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

      D.     The Ceebraid Defendants' Motion for Partial Summary Judgment

          1.    *Fraud and Civil Conspiracy*

The Ceebraid Defendants argue that Benchmark's fraud and conspiracy

claims fail as a matter of law.  They argue that Benchmark has not produced

admissible evidence showing that Ceebraid did not intend to perform its

obligations under the Letter Agreement when it was executed.  (Ceebraid MSJ

[208] at 10; Ceebraid Reply [234] at 2-6.)  They also argue Benchmark may not

use evidence of a subsequent breach of contract to infer a lack of intent to perform

at the time Ceebraid executed the contract.  (Ceebraid MSJ at 10.)  They argue that

they are entitled to summary judgment on the civil conspiracy claim because the

underlying fraud claim fails.  (Id. at 11-12.)

Common law fraud consists of five elements:  "(1) false representation by

defendant; (2) with scienter, or knowledge of falsity; (3) with intent to deceive

plaintiff or to induce plaintiff into acting or refraining from acting; (4) on which

plaintiff justifiably relied; (5) with proximate cause of damages to plaintiff."

Worsham v. Provident Cos., Inc., 249 F. Supp. 2d 1325, 1331 (N.D. Ga. 2002)

(citing Lakeside Inv. Group, Inc. v. Allen, 253 Ga. App. 448, 450 (2002)).  "In

most circumstances, actionable fraud cannot be predicated on a promise contained

in a contract because the promise is to perform some act in the future."  BTL COM

Ltd., Co. v. Vachon, 278 Ga. App. 256, 258 (2006).  However, "[a]n exception to

the general rule exists where a promise as to future events is made with a present

intent not to perform or where the promisor knows that the future event will not

take place."  Buckley v. Turner Heritage Homes, Inc., 248 Ga. App. 793, 795

(2001) (citing Bradley v. British Fitting Group, 221 Ga. App. 621, 624(4) (1996)).

"Actionable fraud does not result from a mere failure to perform promises

made; otherwise, any breach of contract would amount to fraud.  Fraud does occur,

however, when a party enters into a contract with no present intention of

performing his promises."  Brock v. King, 279 Ga. App. 335, 339 (2006).  "The

well recognized exceptions to this rule are promises made without present intent to

perform, which is a misrepresentation of a present state of mind . . . and promises

made as an inducement to enter a contract."  Goodlett v. Ray Label Corp., 171 Ga.

App. 377, 378 (1984) (citing Middlebrooks v. Lonas, 246 Ga. 720 (1980)).  To

qualify as an exception, "the promise (or concealment) [must] be made in a manner

as to deceive and mislead . . . . [K]nowledge of the falsehood constitutes an

essential element."  <u>Cmty. Fed. Sav. & Loan Ass'n v. Foster Developers, Inc.</u>, 179

Ga. App. 861, 864 (1986); <u>see also</u> O.C.G.A. § 51-6-2(b) ("A fraudulent or

reckless representation of facts as true when they are not, if intended to deceive, is

equivalent to a knowledge of their falsehood even if the party making the

representation does not know that such facts are false.").

Benchmark may not simply show that Ceebraid, after executing the contract,

did not perform the contract.  <u>Pacrim Assocs. v. Turner Home Entm't, Inc.</u>, 235

Ga. App. 761, 767 (1998) ("In support of their [fraud] assertion, plaintiffs only

point to evidence showing that *subsequent* to the parties' oral agreement,

[defendant] did not intend to comply with the promise. While such evidence might

support a claim for breach of contract, it does not show that [defendant] did not

intend to comply with the agreement *at the time the promise was made*.").  A fact-

finder, however, is entitled infer a present intent to deceive from certain subsequent

actions.  <u>See</u> <u>Gunnin v. Dement</u>, 205 Ga. App. 631, 633 (1992) ("The jury was

authorized to consider evidence of the defendants' conduct following the

agreement in assessing whether or not the defendants had a present intent to

perform at the time of contract execution.");  <u>Rogers v. deMonteguin</u>, 193 Ga.

App. 480, 481-82 (1989) (holding there was sufficient evidence for a jury to

conclude the defendant building contractor did not intend to perform the contract

in light of evidence that defendant performed shoddy work, "made no real attempt to complete the job," and told a subcontractor that he had no intention of completing the job and that the plaintiff would have to sue him).

The Court finds that there is sufficient evidence from which a fact-finder could infer that Ceebraid did not intend to perform when it signed the Letter Agreement. For example, Defendant Zarrilli testified that Ceebraid informed him they believed the Letter Agreement had no effect, and they had not intended for it to have effect. (Zarrilli Dep. [221] at 136.) Haigh also testified that during the March 18, 2005, telephone conversation, Richard Schlesinger told him that Ceebraid did not intend for Benchmark to manage the Hotel after the Hotel was scheduled to close for renovations.

Evidence of Ceebraid's subsequent conduct after signing the Letter Agreement also would allow a fact-finder to infer that they intended to deceive Benchmark when they signed the Letter Agreement. As early as January 2005, only two months after signing the Letter Agreement, Ceebraid began negotiating with other management companies for the operation of the Hotel. (II Pl. SMF ¶ 34; R. Schlesinger Dep. [221] at 70.) Several witnesses testified that Ceebraid refused to discuss formalizing a new management agreement, would not return Benchmark's calls, and cancelled meetings. (II Pl. SMF ¶ 21; Farina Dep. [221] at

20, 25; Haigh Dep. [221] at 31-32.)  Viewing this evidence in the light most favorable to Benchmark, the Court finds that a genuine issue of material fact exists with respect to Ceebraid's present intention to perform at the time it signed the Letter Agreement.  United of Omaha, 894 F.2d at 1558.

The Ceebraid Defendants' only argument for summary judgment on the civil conspiracy claim is that the underlying fraud claim fails as a matter of law.  Since there is sufficient evidence to support Benchmark's fraud claim, there is also sufficient evidence of fraud to support Benchmark's claim for civil conspiracy.[8]

2.    *Aiding and Abetting Fraud*

The Ceebraid Defendants next argue that "aiding and abetting fraud" is not a legally cognizable cause of action in Georgia.  They also argue that the claim fails as a matter of law because the underlying fraud claim also fails.  Plaintiffs argue that a claim for aiding and abetting fraud is viable in Georgia.  See O.C.G.A. § 51-12-30; Traub v. Washington, 264 Ga. App. 541 (2003); and JLM Enters., Inc. v. Houston Gen. Ins. Co., 196 F. Supp. 2d 1299 (S.D. Ga. 2002).

_____

[8]  Plaintiffs claims of fraud and civil conspiracy with respect to individual defendants Richard and Andrew Schlesinger also survive Defendants' motion for summary judgment.  It is well-established in Georgia that "an officer of a corporation who takes part in the commission of a tort by the corporation is personally liable therefor."  Lincoln Land Co. v. Palfery, 130 Ga. App. 407, 411 (1973); see also Jennings v. Smith, 226 Ga. App. 765, 766 (1997).

Benchmark relies on O.C.G.A. § 51-12-30 to support its claim that aiding and abetting fraud is a separate cause of action in Georgia.  O.C.G.A. § 51-12-30 provides:  "[i]n all cases, a person who maliciously procures an injury to be done to another, whether an actionable wrong or a breach of contract, is a joint wrongdoer and may be subject to an action either alone or jointly with the person who actually committed the injury."  Benchmark does not cite any authority explicitly addressing the issue of whether Georgia recognizes a cause of action for aiding and abetting fraud or that O.C.G.A. § 51-12-30 establishes the basis for such a claim.[9] Georgia Courts have acknowledged, however, a cause of action for aiding and abetting in "a wide array of civil cases," such as breach of an employment contract by both employer and employee, breach of a restrictive covenant in an employment contract, a client's discharge of his attorney and false repudiation of the attorney's authority to file a suit, a partner's wrongful dissolution of a partnership, a breach of a contract to exchange real property, battery, and trespass to land.  Insight Tech.,

---

[9]  The cases Benchmark relies upon also do not support its argument.  In Traub, the court never mentioned "aiding and abetting" as a separate cause of a action, but instead used the terms in conjunction with the plaintiff's conspiracy claim.  Traub, 264 Ga. App. at 545-46.  Moreover, it does not appear that the Traub plaintiff pleaded "aiding and abetting" as a cause of action.  In JLM, the court mentioned "aiding and abetting fraud" only in listing the plaintiff's allegations but never treated "aiding and abetting fraud" as a distinct cause of action.  JLM, 196 F. Supp. 2d at 1310.

Inc. v. FreightCheck, LLC, 280 Ga. App. 19, 24 (2006) (listing Georgia cases recognizing claims for aiding and abetting certain torts or breaches of contract). Because no Georgia court has explicitly recognized a tort of aiding and abetting fraud, the Court will not do so now.  See Hays v. Paul, Hastings, Janofsky & Walker LLP, No. Civ.A.106cv754-CAP, WL 4448809, at *8 (N.D. Ga. September 14, 2006) (refusing to recognize a cause of action for aiding and abetting fraud through O.C.G.A. § 51-12-30 because Georgia courts have failed to explicitly do so).[10]

The Court finds the Benchmark has not made a sufficient showing that "aiding and abetting fraud" is a legally cognizable cause of action under Georgia

---

[10]   "At most, the Georgia Court of Appeals in R.W. Holdco, Inc.. v. Johnson, 267 Ga App. 859, 865-66 (2004), implicitly recognized the existence of a claim for aiding and abetting fraud."  Hays, 2006 WL 4448809, at *8.  In Holdco, a corporate plaintiff asserted a claim for aiding and abetting fraud against the law firm and the accounting firm that represented it during the sale of certain corporate assets.  The plaintiff claimed that the sale of corporate assets was unauthorized and that the firms suppressed facts regarding the allegedly unauthorized sale.  The Holdco court affirmed the trial court's grant of summary judgment to the professional firms on the grounds that the corporation had clothed the officer who authorized the deal with apparent authority to conduct business on behalf of the corporation.  See id at *8 n.5 (acknowledging Holdco but finding that this was not an explicit recognition of the claim).

law.[11]  Benchmark has not cited any authority, either statutes or case law,

suggesting that "aiding and abetting fraud" is a claim for which the Court can grant

relief.

> 3.     *Unjust Enrichment*

The Ceebraid Defendants argue that Benchmark's unjust enrichment claim

fails because Plaintiffs cannot show any entity other than CSC retained any benefit

at Benchmark's expense.  Thus, they argue all Ceebraid Defendants, other than

CSC, are entitled to summary judgment.  (Ceebraid MSJ at 16.)

"The theory of unjust enrichment applies when as a matter of fact there is no

legal contract . . . , but where the party sought to be charged has been conferred a

benefit by the party contending an unjust enrichment which the benefitted party

equitably ought to return or compensate for."  Ga. Tile Distrib., Inc. v. Zumpano

Enters., Inc., 205 Ga. App. 487, 491 (1992).  "Under Georgia law, an unjust

enrichment claim requires the plaintiff to establish the following: (1) that the

plaintiff conferred a benefit on the defendant and (2) that equity requires the

defendant to compensate the plaintiff for this benefit."  Chem-Nuclear Sys., Inc. v.

Arivec Chems., Inc., 978 F. Supp. 1105, 1110 (N.D. Ga. 1997) (citing Engram v.

---

[11]  Because this case may proceed under a civil conspiracy theory, Plaintiff
will still be permitted to attempt to establish collective conduct in a joint-
wrongdoer context.

Engram, 265 Ga. 804 (1995)).  "Ordinarily, when one renders service or transfers property which is valuable to another, which the latter accepts, a promise is implied to pay the reasonable value thereof."  O.C.G.A. § 9-2-7.

Benchmark summarily submits that Ceebraid-Signal, the parent of CSC, and its principals, the Schlesingers, received a benefit from these services to the same extent as CSC.  (Opp. to Ceebraid MSJ [221] at 22.)  Benchmark offers no evidence to support this claim.  There simply is no evidence how and in what manner or amount a Ceebraid entity other than CSC was unjustly enriched.

Benchmark also argues, for the first time, that the Court should pierce the corporate veil to hold the other entities liable for the unjust gain that CSC received. Benchmark claims the Schlesingers "continually disregarded, or played fast and loose" with corporate entities in regards to the Hotel and that Adam Schlesinger "ignored corporate separateness when [he] signed [the] letter agreement in the name of Ceebraid-Signal."  (Id.)

The legal standard in Georgia for piercing the corporate veil is appropriately high.  The Georgia Court of Appeals has explained:

> The concept of piercing the corporate veil is applied in Georgia to remedy injustices which arise where a party has overextended his privilege in the use of a corporate entity in order to defeat justice, perpetrate fraud or to evade contractual or tort responsibility. Because the cardinal rule

-30-

of corporate law is that a corporation possesses a legal existence separate and apart from that of its officers and shareholders, the mere operation of corporate business does not render one personally liable for corporate acts. Sole ownership of a corporation by one person or another corporation is not a factor, and neither is the fact that the sole owner uses and controls it to promote his ends. There must be evidence of abuse of the corporate form. Plaintiff must show that the defendant disregarded the separateness of legal entities by commingling on an interchangeable or joint basis or confusing the otherwise separate properties, records or control. . . . On the one hand, we are mindful that great caution should be exercised by the court in disregarding the corporate entity. On the other, it is axiomatic that when litigated, the issue of piercing the corporate veil is for the jury, unless there is no evidence sufficient to justify disregarding the corporate form.

Soerries v. Dancause, 248 Ga. App. 374, 375 (2001); see also Nat Katz & Assocs., Ltd. v. Barber, 255 Ga. App. 207, 208-09 (2002); J-Mart Jewelry Outlets v. Standard Design, 218 Ga. App. 459, 460(1) (1995); Derbyshire v. United Builders Supplies, 194 Ga. App. 840, 844(2)(a) (1990).

To pierce the corporate veil, Benchmark must show that the Schlesingers "disregarded the separateness of legal entities by commingling on an interchangeable or joint basis or confusing the otherwise separate properties, records or control." Soerries, 248 Ga. App. at 375. If there is "no evidence sufficient to justify disregarding the corporate form," the Court can decide the issue on summary judgment. Id.

In this case, there is no evidence that the Schlesingers confused separate legal entities.  Benchmark's CEO Sam Haigh testified that Richard Schlesinger believed, and the wording of the Letter Agreement suggests, that the Letter Agreement was only between Benchmark and Ceebraid-Signal.  (Haigh Decl. ¶ 5, Exhibit 7 to Opp. to Ceebraid MSJ.)  Schlesinger was clear in the April 8 letter that "because the Hotel was purchased by an affiliate of Ceebraid, not [Ceebraid-Signal], the Letter Agreement was of no effect."  (Id.)  This evidence indicates that the Schlesingers were aware of corporate distinctions and intended not to confuse or commingle them.  There is no factual basis to pierce the corporate veil here, and the Ceebraid Defendants, except for CSC, are entitled to summary judgment on Plaintiff's unjust enrichment claim.

4.    *Breach of Contract*

The Ceebraid Defendants argue they are entitled to summary judgment on the breach of contract claim because:  1) Texas law applies in determining the enforceability of the Letter Agreement as a contract, and 2) agreements to use best efforts to negotiate are not enforceable under Texas law.  (Ceebraid MSJ at 16-17.) Benchmark argues the Letter Agreement is governed by Georgia law, and whether the Court applies Georgia or Texas law, the Letter Agreement is an enforceable

contract.[12]  (Opp. to Ceebraid MSJ at 9-12.)

       a.    *Choice of Law*

"[I]n determining whether a binding agreement arose between the parties,

courts apply the contract law of the particular state that governs the formation of

contracts."  Caley v. Gulfstream Aerospace Corp., 428 F.3d 1359, 1368 (1th Cir.

2005).  "A federal district [c]ourt is bound to apply the conflict of laws rules

prevailing in the forum state."  Judge v. Am. Motors Corp., 908 F.2d 1565, 1577

(11th Cir. 1990) (citing Trans Caribbean Lines, Inc. v. Tracor Marine, Inc., 748

F.2d 568 (11th Cir. 1984)).  Thus, Georgia choice-of-law rules apply.

"Georgia adheres to the traditional choice-of-law rules for contract–lex loci

contractus."  McGow v. McCurry, 412 F.3d 1207, 1217 (11th Cir. 2005) (citing

Convergys Corp. v. Keener, 276 Ga. 808, 812 (2003)).  "Under the rule of lex loci

---

[12]  Benchmark further asserts that promissory estoppel is an alternative basis on which the Court can enforce the provisions of the Letter Agreement.  (Opp. to Ceebraid MSJ at 14.)  Promissory estoppel is a discreet legal claim for relief with four elements.  Mariner Healthcare, Inc. v. Foster, 280 Ga. App. 406, 412 (2006).  Benchmark's Amended Complaint did not include a claim for promissory estoppel, and Benchmark cannot for the first time assert a claim for promissory estoppel in their responsive pleading to Ceebraid's motion for summary judgment.  Gilmour v. Gates, McDonald and Co., 382 F.3d 1312, 1314-15 (11th Cir. 2004) ("At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Fed. R. Civ. P. 15(a).  A plaintiff may not amend her complaint through argument in a brief opposing summary judgment.").  Promissory estoppel is not a theory at issue in this litigation.

contractus, the validity, nature, construction, and interpretation of a contract are governed by the substantive law of the state where the contract was made." Id. However, an exception to this rule exists "where the contract is made in one state and is to be performed in another state," in which case "the substantive law of the state where the contract is to be performed will apply." Id. (citing Fed. Ins. Co. v. Nat'l Distrib. Co., 203 Ga. App. 763, 765 (1992)).

In this case, the Letter Agreement was to be performed in Georgia. It states that "Benchmark Hospitality will provide management services for the Georgian Terrace Hotel, located in Atlanta, Georgia, in accordance with the terms outlined in the attached [AGL Agreement]. . . ." Section 4.1 of the AGL Agreement, entitled "Duties of Manager," details Benchmark's responsibilities for managing the Hotel. Such responsibilities include numerous activities that Benchmark was required to undertake at the Hotel premises, including:

> (a)    Recruit, employ, relocate, pay, supervise and discharge all employees and personnel necessary for the operation of the Hotel . . . .
> . . .
> (g)    Procure, or arrange for the procurement of all replacement Operating Equipment and Operating Supplies necessary to maintain and operate the Hotel properly in the ordinary course of business;
>
> (h)    Make or install, or cause to be made or installed, in the name of Owner, all capital repairs,

-34-

> decorations, renewals, revisions, alterations, rebuildings,
> replacements, additions, and improvements in and to the
> Hotel building and [furniture, fixtures, and equipment]
> that Manager deems necessary or appropriate for the
> proper operation and maintenance of the Hotel . . . .

The Ceebraid Defendants argue that Benchmark's home offices in Texas provide "support, supervision, and direction with respect to the management of the individual facilities" and that the "group database and reservation system resides in Texas." The bulk of the services contemplated in the Letter Agreement were to be performed in Georgia where the Hotel was located. Georgia law governs the enforceability of the Letter Agreement.

### b.   The Letter Agreement's Enforceability under Georgia Law

"A contract is an agreement between two or more parties for the doing or not doing of some specified thing." O.C.G.A. § 13-1-1. "The elements of a right to recover for a breach of contract are the breach and the resultant damages to the party who has the right to complain about the contract being broken." Budget Rent-A-Car of Atlanta, Inc. v. Webb, 220 Ga. App. 278, 279 (1996); see also Graham Bros.' Const. Co., Inc. v. C. W. Matthews Contracting Co., Inc., 159 Ga. App. 546 (1981). "There can be no breach of an unenforceable contract." Moore v. BellSouth Mobility, Inc., 243 Ga. App. 674, 676 (2000) (citing Dwyer v. McCoy, 236 Ga. App. 326, 328(4) (1999)).

In Georgia, "[i]t is well established that 'no contract exists until all essential terms have been agreed to, and the failure to agree to even one essential term means that there is no agreement to be enforced.'" Kreimer v. Kreimer, 274 Ga. 359, 363 (2001) (quoting Moss v. Moss, 265 Ga. 802, 803 (1995)). "Unless an agreement is reached as to all terms and conditions and nothing is left to future negotiations, a contract to enter into a contract in the future is of no effect." Malone Const. Co., Inc. v. Westbrook, 127 Ga. App. 709, 709 (1972) (citing Wells v. H. W. Lay & Co., 78 Ga. App. 364 (1948) and Russell v. City of Atlanta, 103 Ga. App. 365 (1961)). "An agreement to reach an agreement is a contradiction in terms and imposes no obligation on the parties thereto." Wells, 78 Ga. App. at 367. "If there was in fact any essential part of the contract upon which the minds of the parties had not met, or upon which there was not an agreement, even though the negotiations evidenced a complete willingness, or even an announced determination, to agree in the future upon such issues as might subsequently arise, it must still follow that a valid and binding contract was not made as of the earlier date." Russell, 103 Ga. App. at 367.

Benchmark does not contest the Ceebraid Defendants' claim that the Letter Agreement is an "agreement to agree." Benchmark merely argues that "under Georgia law letters of intent are enforceable under certain circumstances." (Opp.

to Ceebraid MSJ at 10.)  The Letter Agreement states:

> The initial term of this agreement will be six (6) months.
> During this time period, it is the intent of both parties to
> utilize their best efforts to negotiate and put in place a
> long term management agreement for the property.  It is
> anticipated that the long term management agreement
> will be for no less then [sic] a five (5) year term.

The Letter Agreement thus unequivocally states that the parties will negotiate the

terms of a long-term management agreement at a future date and provides none of

the essential terms and conditions necessary to create a contract.[13]  The Letter

Agreement itself reflects the fact that the parties have not agreed to the duration of

the contemplated management agreement, stating only an expectation as to what

the parties will agree in the future:  "[i]t is anticipated that the long term

management agreement will be for no less then [sic] a five (5) year term."  The

Letter Agreement itself provides none of the specificity necessary to constitute an

enforceable contract under Georgia law, as it lacks any reference to the amount of

the management fee, duties of the parties under the management agreement, or

---

[13]  Benchmark cites two cases, <u>Goobich v. Waters</u>, 283 Ga. App. 53 (2006) and <u>Stephens v. Trust For Pub. Land</u>, 475 F. Supp. 2d 1299 (N.D. Ga. 2007), for the proposition that the Letter Agreement is enforceable.  Both cases are distinguishable from the present case.  The subject agreements in <u>Goobich</u> and <u>Stephens</u> both set forth the essential terms and conditions of the contract, including the contract price or a method by which the contract price could be determined, a term the Letter Agreement lacks.

specific parties bound by the agreement.  Benchmark's breach of contract claim therefore fails as a matter of law.

Since the Letter Agreement is an unenforceable "agreement-to-agree"[14] under Georgia law, Benchmark is not entitled to expectation damages with respect to a five-year management agreement.  Any damages associated with lost profits from a purported long-term management agreement are prohibitively speculative as well.  "To recover lost or expected profits, a plaintiff must prove the probable gain with great specificity."  Premier/Ga. Mgmt. Co., Inc. v. Realty Mgmt. Corp., 272 Ga. App. 780, 786 (2005).  The Ceebraid Defendants' motion for summary judgment on the breach of contract claim is granted.

## III.   CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that CSC's Motion to Dismiss Counterclaim [229] is **GRANTED WITHOUT PREJUDICE**.  Plaintiffs' Motion for Summary Judgment on CSC's Counterclaim [201] is **DENIED AS MOOT**.

**IT IS FURTHER ORDERED** that Fremont's Motion for Summary

---

[14]  Benchmark does not argue that any other portion of the Letter Agreement is enforceable.  It only argues that the Letter Agreement is a contract for a long term relationship.  To the extent Plaintiff could have argued the Letter Agreement was at least a contract for a six-month term or a requirement for the parties to negotiate, that argument has been abandoned.

Judgment [207] is **GRANTED**.

**IT IS FURTHER ORDERED** that Ceebraid's Motion for Partial Summary Judgment [208] is **GRANTED IN PART** and **DENIED IN PART**.  Ceebraid's Motion for Partial Summary Judgment is **GRANTED** with respect to Plaintiffs' claims for Aiding and Abetting Fraud, Unjust Enrichment, and Breach of Contract. Ceebraid's Motion for Summary Judgment is **DENIED** with respect to Plaintiffs' claims for Fraud and Civil Conspiracy.

**SO ORDERED**, this 23rd day of July, 2007.


WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE